UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Criminal No. 09-CR-242(MJD/FLN)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | GOVERNMENT'S TRIAL BRIEF |
| | ) | |
| MAHAMUD SAID OMAR, | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, through its attorneys B. Todd Jones, United States Attorney for the District of Minnesota, Assistant United States Attorneys John Docherty, Charles J. Kovats, Jr., and LeeAnn K. Bell, and Justice Department Trial Attorney William M. Narus, respectfully submits the following Trial Brief.

## I.   STATUS OF THE CASE

A. Trial of the defendant Mahamud Said Omar is currently set to begin on October 1, 2012, before the Honorable Michael J. Davis, Chief Judge of the U.S. District Court for the District of Minnesota.

B. Estimated time for the government's case-in-chief is approximately eight trial days.

C. The defendant is currently in custody.

D. Trial by jury has not been waived.

E. Absent any further stipulations between the parties, the government expects to call approximately 25 witnesses in its case-in-chief.

F. The Indictment contains five counts.

## II.  THE CHARGES

On August 20, 2009, a grand jury of this district returned a five-count indictment charging the defendant Mahamud Said Omar with: Count One, Conspiring to Provide Material Support to Terrorists, in violation of 18 U.S.C. § 2339A(a); Count Two, Providing Material Support to Terrorists, in violation of 18 U.S.C. § 2339A(a); Count Three, Conspiring to Provide Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1); Count Four, Providing Material Support to a Foreign Terrorist Organization, in violation of 18 U.S.C. § 2339B(a)(1) and 2; and Count Five, Conspiring to Kill, Kidnap, or Maim Overseas, in violation of 18 U.S.C. § 956(a).

## III. APPLICABLE STATUTES

### A.    Counts One and Two

The defendant is charged in Count One with Conspiring to Provide Material Support or Resources to Terrorists, and in Count Two with Providing Material Support or Resources to Terrorists. Title 18, United States Code, Section 2339A provides in part:

> (a) Whoever provides material support or resources . . . knowing or intending that they are to be used in preparation for, or in carrying out, a violation of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of [Title 18] . . . shall be fined under this title, imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years

or for life. A violation of this section may be prosecuted in any Federal judicial district in which the underlying offense was committed, or in any other Federal judicial district as provided by law.

For Counts One and Two, the term "material support or resources" is quite broadly defined at Title 18, United States Code, Section 2339A(b):

> (b) Definitions.--As used in this section– (1) the term "material support or resources" means any property, tangible or intangible, or service, including currency or monetary instruments or financial securities, financial services, lodging, training, expert advice or assistance, safehouses, false documentation or identification, communications equipment, facilities, weapons, lethal substances, explosives, personnel (1 or more individuals who may be or include oneself), and transportation, except medicine or religious materials.

**B.    <u>Counts Three and Four</u>**

The defendant is charged in Count Three with Conspiring to Provide Material Support or Resources to a Foreign Terrorist Organization, and in Count Four with Providing Material Support or Resources to a Foreign Terrorist Organization.  Title 18, United States Code, Section 2339B provides in part:

> (a) Whoever knowingly provides material support or resources to a foreign terrorist organization, or attempts or conspires to do so, shall be fined under this title or imprisoned not more than 15 years, or both, and, if the death of any person results, shall be imprisoned for any term of years or for life.  To violate this paragraph, a person must have knowledge that the organization is a designated terrorist organization . . . that the organization has engaged or engages in terrorist activity . . . or that the organization has engaged or engages in terrorism.

C.   **<u>Defined Terms</u>**

1.   "**Foreign Terrorist Organization**"

A "foreign terrorist organization" is an organization designated as such by the Secretary of State, following consultation with the Attorney General and the Secretary of the Treasury.

2.   "**Terrorist Activity**"

The term "terrorist activity" is defined as any activity which is unlawful under the laws of the place it was committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any particular State), and which involves any of the following: (1) the seizing or detaining, and threatening to kill, injure, or continue to detain another individual in order to compel a third person (including a governmental organization) to do or abstain from doing any act as an explicit or implicit condition for the release of the individual seized or detained; (2) an assassination; (3) the use of any explosive, firearm, or other weapon or dangerous device other than for mere personal monetary gain, with the intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property; and (4) a threat, attempt, or conspiracy to do any of the above acts.  8 U.S.C. § 1189.

3. **"Terrorism"**.

The term "terrorism" means a premeditated, politically-motivated violence perpetrated against non-combatants targeted by sub-national groups or clandestine agents. 22 U.S.C. 2656f(d)(2).

D.        **Count Five**

The defendant is charged in Count Five with Conspiring to Kill, Kidnap, or Maim Outside the United States. Title 18, United States Code, Section 956 provides in part:

> Whoever, within the jurisdiction of the United States, conspires with one or more other persons, regardless of where such other person or persons are located, to commit at any place outside the United States an act that would constitute the offense of murder, kidnapping, or maiming if committed in the special maritime and territorial jurisdiction of the United States shall, if any of the conspirators commits an act within the jurisdiction of the United States to effect any object of the conspiracy, be punished [for any term of years or for life, if the offense is conspiracy to murder or kidnap]

IV. **ELEMENTS AND OTHER PERTINENT LAW OF THE CHARGED OFFENSES**

A. **Count One**

1. **Elements**

Count 1 of the Indictment alleges that from in or about September 2007 through "the present" (the indictment was filed on August 20, 2009), the defendant conspired with others to provide material support or resources in preparation for, or to carry out a conspiracy to murder, kidnap, or maim outside the United States.

To sustain the charge of conspiracy as alleged in Count One, the Government must prove three elements:

*One,* that sometime after in or about September 2007 and before August 20, 2009 two or more persons reached an agreement or came to an understanding to provide material support or resources; and

*Two*, that the defendant voluntarily and intentionally joined in the agreement or understanding either at the time it was first reached or at some later time while it was still in effect, knowing that the material support or resources provided were to be used in preparation for, or in carrying out, a conspiracy to murder or maim outside the United States.

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

### B. Count Two

Count 2 of the Indictment alleges that from in or about September 2007 through "the present" (August 20, 2009, the date on which the indictment was filed), the defendant provided material support or resources in preparation for, or to carry out a conspiracy to murder, kidnap, or maim outside the United States. To sustain the charge as alleged in Count Two, the Government must prove two elements:

*One,* that the defendant did provide or attempt to provide material support or resources; and

*Two,* that the defendant did so knowing that the material support or resources were to be used in preparation for or in

carrying out a conspiracy to murder or maim outside the United States.

The defendant may also be found guilty of Count Two even if he personally did not do every act constituting the offense if he aided and abetted the provision of material support or resources to a conspiracy to murder or maim outside of the United States.

### C.    **Count Three**

Count 3 of the Indictment alleges that after March 18, 2008 and before August 20, 2009, the defendant conspired to provide material support or resources to a foreign terrorist organization. To sustain the charge of conspiracy as alleged in Count Three, the Government must prove three elements:

*One*, that after March 18, 2008 and before August 20, 2009, two or more persons reached an agreement or came to an understanding to provide material support or resources to a foreign terrorist organization, namely al Shabaab;

*Two*, that the defendant voluntarily and intentionally joined in the agreement or understanding, either at the time it was first reached or at some later time while it was still in effect; and

*Three*, at the time the defendant joined in the agreement or understanding, he knew the purpose of the agreement or understanding.

D.    Count Four

Count 4 of the Indictment alleges that after March 18, 2008 and before August 20, 2009, the defendant provided material support or resources to a foreign terrorist organization.  To sustain the charge as alleged in Count Four, the Government must prove four elements:

*One*, that the defendant knowingly provided material support or resources;

*Two,* that the defendant knew that the support or resources was going to al-Shabaab;

*Three*, that al Shabaab previously had been designated as a Foreign Terrorist Organization by the Secretary of State;

*Four*, that the defendant knew that one or more of the following conditions existed:

>    a.    That al Shabaab had been designated as a
>    Foreign Terrorist Organization; *or*
>
>    b.    That al Shabaab has engaged or engages in terrorist
>    activity; *or*
>
>    c.    That al Shabaab has engaged or engages in
>    terrorism;  and

*Five,* that one or more of the following three conditions is met:

>    a.    The defendant is an alien lawfully admitted for
>        permanent residence in the United States; or

8

      b.    The offense occurred in whole or in part within the United States; or

      c.    The offense occurred in or affected interstate or foreign commerce.

**E.    <u>Law Regarding Providing Material Support</u>**

In *United States v. Hassoun*, 476 F.3d 1181 (11th Cir. 2007), the Eleventh Circuit addressed the differences between the charges of Providing Material Support, in violation of 18 U.S.C. § 2339A, and a Conspiracy to Kill Outside the United States, in violation of 18 U.S.C. § 956. There, the defendants were charged with participating in a support cell to promote violent Islamic *jihad*. *Id.* at 1183. The district court dismissed the charge alleging that the defendants had conspired to kill outside the United States, finding it was multiplicitous. *Id.* at 1184. The Eleventh Circuit reversed, stating with respect to the difference between a 2339A charge and a 956 charge:

> [T]he government need not prove all the elements of §956, the object offense, in order to satisfy the elements of the substantive §2339A charge. By its elements, §2339A criminalizes material support given "in preparation for" the object offense – clearly, the object offense need not even have been completed yet, let alone proven as an element of the material support offense. To meet its burden under §2339A, the Government must at least prove that the defendants provided material support or resources knowing that they be used in preparation for the §956 conspiracy (assuming that, under this scenario, the §956 conspiracy had not yet come to exist).

*Id.* at 1188.

9

Indeed, the Second Circuit's decision in *United States v. Stewart*, 590 F.3d 93, 119 (2d Cir. 2009), demonstrates that a conviction for providing material support to a conspiracy to kill outside the United States does not require that the defendant have committed the predicate offense of conspiring to kill outside of the United States: "[The] government need not have established beyond reasonable doubt that [the defendants] engaged in a conspiracy to kidnap or commit murder abroad [the underlying enumerated offense]; neither [defendant] was charged with doing either. Instead, both were charged with and convicted of violating section 2339A." *Id.* at 119.

Moreover, unlike a charge of providing material support to a designated foreign terrorist organization, in violation of 18 U.S.C. §2339B, the charge of providing material support to a conspiracy to kill abroad does not require proof that the material support was provided to a particular organization or terrorist. *See United States v. Chandia*, 514 F.3d 365, 372 (4th Cir. 2008)(contrasting the elements of §2339B with § 2339A and observing that §2339B requires proof that the material support was provided to an organization); *see also United States v. Sattar*, 314 F. Supp. 2d 279, 295-296 (S.D.N.Y. 2004) ("Title 18 U.S.C. §2339A . . . does not penalize the provision of material support or resources to an FTO, but rather makes it a crime to provide material support or resources or conceal or disguise the nature, location, or source of

10

such material support or resources 'knowing or intending that they are to be used in preparation for, or in carrying out, a violation' of specific violent crimes-in this case, a violation of 18 U.S.C. § 956, which prohibits a conspiracy to kill or kidnap persons in a foreign country.").

### F.    Count Five

In order for the defendant to be found guilty of conspiracy to murder, kidnap, or maim outside the United States as charged in the Count Five of the Indictment, the Government must prove each of the following four elements beyond a reasonable doubt:

*One*, beginning sometime after September 2007, and sometime before August 20, 2009, two or more persons reached an agreement or came to an understanding to commit an act outside the United States that would constitute the offense of murder, kidnaping, or maiming, if committed within the jurisdiction of the United States;

*Two*, the defendant knowingly became a member of that conspiracy;

*Three*, the defendant became a member of the conspiracy while he was within the jurisdiction of the United States; and

*Four*, one of the persons involved in the conspiracy performed within the United States at least one overt act for the purpose of carrying out the conspiracy.

11

G.     **Law Regarding Conspiracy to Kill or Maim Outside the United States**

Federal law prohibits the commission of an act at any place outside the United States that would constitute the offense of murder, kidnaping, or maiming if committed in the jurisdiction of the United States.  *See* 18 U.S.C. § 956; *United States v. Khan*, 309 F.Supp.2d 789, 821-822 (E.D. Va. 2004).  "Murder" is defined in 18 U.S.C. § 1111(a) as "unlawful killing with malice aforethought." The object of a Section 956 conspiracy can also be a kidnapping, however in this case the government has not alleged, and will not offer proof at trial, of kidnapping. "Maiming" is defined in 18 U.S.C. § 114 as, among other things, the cutting off or disabling a limb of another person.

V.     **STATEMENT OF THE FACTS**

In the fall and winter of 2007, the defendant and his conspirators formed a secretive plan in which ethnic Somali men residing in Minneapolis would return to Somalia to conduct *jihad* alongside Islamic extremists against the Ethiopian military forces who had been invited into Somalia by the internationally-supported Transitional Federal Government of Somalia ("TFG").

The conspiracy to kill and maim the Ethiopians included men in Minneapolis and men and women in Somalia.  In Minnesota, it involved men raising money for travel to Somalia, and then traveling there.  In Somalia, it included the use of safe houses operated by members of the conspiracy.  It included the issuance of

12

AK-47s and other weapons, and training on their use. It included the construction of a training camp in southern Somalia and instruction from senior members of al Shabaab, including Shaykh Mukhtar Robow, and a senior al Qaeda operative in East Africa, Saleh Ali Saleh al-Nabhan, as documented in an al Shabaab propaganda video. The defendant traveled to Somalia in January of 2008, and lived in an al Shabaab safe-house in Marka, Somalia for a time. He provided funds with which to buy firearms, and contributed additional money to the proprietor of the al Shabaab safe-house.

The defendant returned to Minnesota without attending the al Shabaaab training camp. In August of 2008, the defendant accompanied two men to the Minneapolis-St. Paul International Airport, where they boarded a flight to Philadelphia, from where they traveled onwards, eventually arriving in Somalia.

Also in the summer of 2008, the conspiracy achieved its object with an ambush of Ethiopian troops by the defendant's conspirators from Minneapolis, together with senior members of al Shabaab, such as Omar Hammami. This ambush is documented in an al Shabaab propaganda video. Then on October 29, 2008, Shirwa Ahmed, a member of the conspiracy, conducted one of five coordinated suicide bombings targeting an Ethiopian Consulate, the Somaliland Presidential Palace, a United Nations office, and two offices of the Puntland Intelligence Service.

13

Just days after Shirwa Ahmed's suicide, the defendant accompanied several men to a travel agency in the Stadium Village area of Minneapolis, where they bought air tickets to Somalia. The defendant accompanied one of the men to a local bank, where he withdrew funds with which to pay for his ticket. The defendant had been directed, in a telephone call received from co-conspirator Ahmed Ali Omar in Somalia, to assist these travelers with the purchase of their tickets.

In November of 2008, the government intercepted, pursuant to an order of a federal court, several telephone calls between the defendant and another member of the conspiracy. Recordings of those calls will be played at trial.

The defendant was arrested in the Netherlands on November 8, 2009. In interviews with the FBI following his arrest, the defendant made several inculpatory admissions. In late May and early June of 2011 the defendant was again interviewed by law enforcement and made additional statements.

The government anticipates the evidence adduced at trial will prove the following facts:

A.    **Pre-Departure Activities During 2007.**

In or about September 2007, conspirators Khalid Abshir ("Abshir") and Ahmed Ali Omar ("Omar"), among others, began meeting with Abdifatah Yusuf Isse ("Isse"), Kamal Hassan ("Hassan"), and Salah Ahmed ("Salah Ahmed"). The meetings were held behind closed

doors at a mosque, in cars, in private rooms at restaurants, and in one person's apartment. In these meetings, Abshir and Omar talked of the need to fight *jihad* in order to oust the Ethiopian armed forces from Somalia (which had actually been invited into Somalia by the Transitional Federal Government). Eventually, Isse, Hassan, and Salah Ahmed agreed to travel to Somalia. They believed they would either be fighting for the Islamic Courts Union or for a group they knew as al Shabaab. At this time, Isse, Hassan, and Salah Ahmed either thought al Shabaab was a part of the Islamic Courts, or did not know anything about al Shabaab.

Before departure for Somalia, this group raised money for their travel by falsely soliciting for charities.

The defendant also participated in the financing of the trip to Somalia by providing several hundred dollars to Omar to be used as "pocket money" by the travelers. This money was spent on food, hotels, and clothing by the travelers. A portion of this money was also passed on to another conspirator so that conspirator could travel to Somalia (although that conspirator then did not travel to Somalia). The defendant also verbally expressed his support for what the men were doing.

**B.   The 2007 Travelers Depart for Somalia**

On October 30, 2007, Dahir Gure departed Minneapolis for Somalia.

15

On December 4, 2007, Shirwa Ahmed departed Minneapolis to Saudi Arabia to participate in the Hajj, after which he traveled onwards to Somalia.

On December 6, 2007, Hassan and Salah Ahmed departed Minneapolis and flew to Dubai, United Arab Emirates.

On December 8, 2007, Omar and Isse left Minneapolis and after flying overnight, met Hassan and Salah Ahmed in Dubai the following day.  All four men then flew from Dubai to Hargeisa, Somalia, via Djibouti.

On December 12, 2007, Khalid Abshir flew out of Minneapolis, and on December 15, 2007 he flew out of Washington Dulles Airport with a final destination of Somalia.

## C.    Actions in Somalia

The seven men who had left from Minneapolis in the early winter of 2007 reunited at a safe-house in Marka, Somalia.  They were provided weapons training and met with senior leaders of al Shabaab.  The defendant, who departed the United States on January 22, 2008, arrived at the Marka safe-house in early February, 2008. While at the Marka safe-house, the defendant provided money to the proprietor of the safe-house and also provided money to purchase weapons for the men from Minneapolis.  After approximately ten days, the defendant left Marka, traveled to Baardhere, got married, and then returned to the United States on April 19, 2008.

16

Later, after the defendant left, at a different safe-house in the Somali town of Baarawe, the men from Minneapolis, along with other members of al Shabaab, were issued AK-47s and ammunition. There was an AK-47 with the defendant's name on it, however, the defendant was not there to receive it. The men were trained how to handle and load the weapons, and with the exception of Abshir, who had become ill, the men went on to construct an al Shabaab training camp in far southern Somalia, near the town of Kismayo. They took their weapons with them from Baraawe to the site where they would be put to work building the training camp.

When the men arrived at the camp site, they were divided into groups and began to construct the camp. Under the supervision of the leaders, they began cutting down trees and clearing brush. Salah Ahmed and Isse left the camp and began making their way back to the United States. Shirwa Ahmed also left the camp to assist a friend, but was persuaded to return to the camp by his conspirators in Somalia.

The remaining men from Minneapolis along with other recruits were provided weapons training, religious instruction and anti-Western propaganda. The camp received visits from senior members of al Shabaab. An al Shabaab "media" crew arrived to film a propaganda video that depicted recruits training and featured an English-language recruiting appeal made by a man from Minneapolis. Robow and Nabhan appear in the video.

17

In mid-July 2008, after graduating from the training camp, the remaining men from Minneapolis were assigned to a group of foreign fighters and dispatched to ambush Ethiopian troops traveling along a road in Somalia.  The preparations and ambush were filmed by a member of the conspiracy and produced as an al Shabaab propaganda video.  Senior members of al Shabaab narrate the video and a man from Minneapolis makes a speech to the camera in which he encourages more men to join them in Somalia.

**D.    The Defendant Helps the 2008 Travelers Join al Shabaab**

In August 2008, the defendant accompanied Mohamed Hassan and Mustafa Salat, two individuals who had been deemed too young to travel in December 2007, to the airport knowing they would be traveling to Somalia to join al Shabaab.

On October 29, 2008, five coordinated attacks by suicide truck bombers occurred in Hargeisa, Somaliland, and Boosaaso, Puntland, (both Somaliland and Puntland are Somali territories).  The bombings resulted in the death of the suicide bombers, including Shirwa Ahmed, a member of the conspiracy and a former resident of Minneapolis, as well as approximately 22 other persons.  FBI Special Agents went to one of the bombing sites in Hargeisa and retrieved the remains of Shirwa Ahmed.

Within days of Shirwa Ahmed's bombing, the defendant assisted a group of six additional men travel to Somalia to join al-Shabaab, including Mohamoud Ali Hassan (departed on November 1, 2008), Troy

18

Matthew Kastigar (November 3), Abdikadir Ali Abdi (November 3), Jamal Sheikh Bana (November 3), Burhan Ibrahim Hassan (November 4), and Abdisalan Hussein Ali (November 4), with their travel to Somalia to join al Shabaab. The defendant was with these men on October 31, 2008 at a Minneapolis travel agency where they purchased air tickets with a final destination of Somalia.

On November 2, 2008, the defendant was at a dinner being held for the men who were to depart Minnesota for Somalia over the following couple of days.

## VI.   EVIDENTIARY ISSUES

### A.   Stipulations

A stipulation is evidence introduced by both parties, so neither may complain on appeal that the evidence was erroneously admitted. *United States v. Smith*, 632 F.3d 1043, 1047 (8th Cir. 2011). (At trial, defendant stipulated to admission of forensic chemists' lab report. The court rejected defendant's claim that district court's admission of the report violated his right to confront adverse witnesses). Where the defendant is aware of the stipulation, and does not object to the stipulation in court, the court presumes the defendant has acquiesced in his counsel's stipulation. *United States v. Robinson*, 617 F.3d 984, 989-90 (8th Cir. 2010).

The government and the defendant have agreed to stipulate to several preliminary matters including authentication and foundation

for various bank records, telephone company records, travel records and other electronic communications. The government and the defendant have also agreed to stipulate that Mr. Shirwa Ahmed participated in a vehicle-borne improvised explosive device attack in Somalia on October 29, 2008, and the results of subsequent forensic testing related to that attack.

The government has invited the defendant to stipulate to the accuracy of several foreign translations and the foundation to several intercepted communications, including both FISA-derived evidence and jail calls. The defendant has declined to do so.

**1.   <u>Foreign Language Stipulation - The Rotterdam Interview.</u>**

The defendant was interviewed by the FBI on November 8 and 9, 2009. The interview took place in the Central Police Station in Rotterdam, the Netherlands. Two interpreters were present, one for Somali/Dutch, the other for Dutch/English. The interpreters were provided by the Dutch government. The defendant litigated the voluntariness of these two statements at the motions hearing in this case. He did not raise inaccurate translation as an issue then. One of the interpreters from the Rotterdam interview is in the Netherlands, while the other has been deployed overseas with the Dutch armed forces. These interpreters will not be testifying at trial. The defendant is now declining to stipulate to the accuracy of the interpretation. Nevertheless, the defendant's

20

Rotterdam statements are admissible without the interpreters, because there is overwhelming evidence that the interpretation was done accurately.

First, the FBI Agents were able to conduct a coherent, logical interview of the defendant. When the agents asked a question, they got an answer that was responsive to the question asked. There were no serious communication difficulties over the prolonged period of the interview. Second, the case agent will testify that on breaks during the interview, the FBI Agents chatted with other people in the room, including the Somali/Dutch interpreter, in the English language (the English/Dutch interpreter obviously was fluent in English). Had the Somali/Dutch interpreter heard her work being mis-translated into English, she could have been expected to have pointed that out. She did not. Third, the defendant himself spoke in English at various times during the interview. While the defendant's English is less than fluent, had he heard his words being mis-translated, he too might have been expected to say something to that effect. He did not. *See*, *United States v. Lopez*, 937 F.2d 716, 724 (2d Cir. 1991)(when both defendants in the case spoke English and heard the translation, but did not correct any part of the interpreter's translation "it stands to reason that if [the interpreter] had distorted their conversation they would have noticed it and corrected her").

Whether law enforcement and a person being interviewed understood each other is a question of fact, *see, e.g., United States v. Kim*, 803 F.Supp. 352, 357-58 (D. Hawaii 1992)(in context of pretrial suppression motion, district court considers evidence of defendant's knowledge of English in ruling on admissibility of statement).

Cases in which the question is whether law enforcement and interview subject understand each other when they communicate through an interpreter are a subset of these cases, in which the question of interpretive accuracy continues to be treated as a question of fact for the jury. *See, e.g., United States v. Fuji*, 301 F.3d 535, 540 (7th Cir. 2002)("it is not our job to determine whether Ha's translated version of Fuji's sworn statement should be disregarded, rather it is "the function of the finder of fact to weigh the evidence presented by the parties as to the accuracy of the proffered translation and to determine the reliability of the translation on the basis of that evidence")(*quoting United States v. Zambrana*, 841 F.2d 1320, 1337 (7th Cir. 1988).

Given the significant circumstantial evidence that the interpretation was accurate, and the earlier judicial findings that the statement was voluntarily given and that the defendant

understood his rights, the statement should be admitted even over a defense objection.[1]

### 2.   FISA-Derived Evidence.

Should the defendant elect not to stipulate to the authentication and foundation of any FISA-derived evidence, the government intends to call two FBI witnesses familiar with the process by which such evidence is obtained from various telecommunications providers.  Given that the Court has already determined that the FISA collection relevant to this case was lawfully conducted, the government believes no further foundation is required.

---

[1]   In *United States v. Martinez-Gaytan*, 213 F. 3d 890, 893 (5th Cir. 2000) the Fifth Circuit held that "*where the particular facts of a case cast significant doubt upon the accuracy of a translated confession*, the translator or a witness who heard and understood the untranslated confession must be available for testimony and cross-examination at the suppression hearing before the confession can be admitted." (emphasis supplied).  Martinez-Gaytan arose at the motions hearing point of a case, not at trial, and dealt primarily with Confrontation Clause and hearsay issues, not overall reliability (although an analysis of overall reliability was folded into the hearsay analysis).  It should not be considered controlling, and in any event does not hold that interpretive accuracy is anything but a jury issue at trial.  the *Martinez-Gaytan* Court noted that "where a translator functions successfully and the parties encounter no serious communication difficulties over a prolonged period of time, a defendant will find it very difficult to persuade the court that the translated confession should be suppressed on account of its unreliability." 213 F.3d at 893.

### B.    Defendant's Statements

A defendant cannot elicit his own prior statements.  Fed. R. Evid. 801(d)(2)(A); *United States v. Hughes*, 535 F.3d 880, 882 (8th Cir. 2008) (self-serving statement of defendant not admissible as statement against interest or under residual hearsay exception). Additionally, a defendant cannot admit additional out-of-court statements, even when the government admits a portion of a defendant's out-of-court statement, because such statements are hearsay when offered by the defendant.  Fed. R. Evid. 801(d)(2).

The government intends to offer the statements the defendant provided the FBI in November 2009, at Rotterdam and in May/June of 2011 at Vught.   The government intends to introduce these statements through testimony from FBI Special Agent Kiann VanDenover, who participated in both interviews.

### C.    The Defendant's Statements During a Proffer

The government has provided notice to the defendant that the government intends to admit the statements he made during proffer sessions with the government in the government's case-in-chief. The government filed a motion *in limine* with the Court on this issue, and the Court held the proffer admissible in the government's case-in-chief.

### D.    Co-Conspirator Statements

Declarations by one co-conspirator during the course of and in furtherance of the conspiracy may be used against another

conspirator because such declarations are not hearsay. Fed. R. Evid. 801(d)(2)(E) (a statement is not hearsay if it is "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy."). Rule 801(d)(2)(E) applies even if the declarant is not charged with the crime of conspiracy. *United States v. Mahasin*, 362 F.3d 1071, 1084 (8th Cir. 2004).

For a statement to be admissible under Rule 801(d)(2)(E), the offering party must establish that: (a) the statement was in furtherance of the conspiracy; (b) it was made during the life of the conspiracy; and (c) there is, including the co-conspirator's declaration itself, sufficient proof of the existence of the conspiracy and of the defendant's connection to it. *Bourjaily v. United States*, 483 U.S. 171, 175 (1986); *United States v. Hyles*, 521 F.3d 946, 959 (8th Cir. 2008); *Mahasin*, 362 F.3d at 1084. The term "in furtherance of the conspiracy" is meant to be construed broadly. *United States v. Ragland*, 555 F.3d 706, 713 (8th Cir. 2009). A district court need not make an explicit ruling if it substantially complied with these procedures. *United States v. Fuller*, 557 F.3d 859, 865 (8th Cir. 2009). Whether the offering party has met its burden is to be determined by the trial judge, and not the jury. *Id.* The declaration itself, together with independent evidence, may constitute sufficient proof of the existence of the conspiracy and the involvement of the defendant

and declarant in it. *Bourjaily*, 483 U.S. at 181; *Ragland*, 555 F.3d at 713.

The foundation for the admission of a co-conspirator statement may be established before or after the admission of the statement. If a proper foundation has not yet been laid, the court may nevertheless admit the statement, but with an admonition that the testimony will be stricken should the conspiracy not be proved. *Ragland*, 555 F.3d at 713. Co-conspirator statements fall within a "firmly rooted hearsay exception." Therefore, if a statement is properly admissible under Rule 801(d)(2)(E), no additional showing of reliability is necessary to satisfy the requirements of the Confrontation Clause. *Bourjaily*, 483 U.S. at 183-184.

The government intends to offer testimony from several witnesses who will relate statements made by the defendant and his conspirators in furtherance of the conspiracy. By way of example, the government expects to elicit testimony that one of the defendant's co-conspirators, Salah Ahmed, while at an al Shabaab safe house in Marka, Somalia, was advised by another member of the conspiracy, Omar, that the defendant had given money to Omar which Omar had then passed on to a man named Farhan, who had taken the money but then not traveled to Somalia. This testimony is admissible as a statement of a co-conspirator.[2]

_____

[2] The defendant cannot admit statements of his conspirators under Rule 801(d)(2)(E); however, the United States can do as is it is not a party under the rule. *See United States v. Abbas*, 74 F.3d

The government also intends to admit the contents of a telephone call between Kamal Said Hassan ("Hassan"), once one of defendant's co-conspirators, and two members of al Shabaab.  This call occurred after Hassan had returned to the United States.  During the call, one of the members of al Shabaab asked about Hassan's parents.  When Hassan indicated that his parents were well, the member of al Shabaab advised Hassan that the defendant had previously informed him that Hassan's parents had been arrested.  In the government's view, the conversation between the defendant and the member of al Shabaab that Hassan's parents had been arrested is admissible under Rule 801(d)(2)(E).  Had Hassan's parents in fact been arrested it would have caused apprehension among members of al Shabaab that Hassan might speak to law enforcement about his knowledge of al Shabaab.

### E.   Statements to Show Knowledge or Explain Conduct

Statements are not hearsay if they are introduced to show the effect of a listener's conduct, or establish "knowledge" on the part of a listener.  *United States v. Roberts*, 676 F.2d 1185, 1187-88 (8th Cir. 1982), *cert. denied*, 459 U.S. 855 (1982).

### F.   Refreshing Recollection and Past Recollection Recorded

A witness may not remember details of events that occurred. Witnesses experiencing difficulty with recall may have their

506, 511 (4th Cir. 1996) ("But the prosecution is not a 'party' against whom such testimony [under Rule 801(d)(2)(E)] may be tendered").

recollection refreshed by any material; however, such materials are not themselves admitted into evidence. Fed. R. Evid. 612.

Additionally, a memorandum or record concerning a matter about which a witness once had knowledge but now has insufficient recollection to enable the witness to testify fully and accurately, shown to have been made by the witness when the matter was fresh in the witness's memory and to reflect that knowledge correctly, is admissible as an exception to the hearsay rule. Fed. R. Evid. 803(5). Such a record may be read into evidence but may not itself be received into evidence. *Id.* The government expects to admit proof of the past recollection of witness Abdifatah Yusuf Isse ("Isse") through a writing of a phone number made by Isse more than two years ago.

## G.    Scope of Cross-Examination

A witness's use of an illegal drug is not a permissible ground for cross examination, as it does not bear on the credibility of the witness.  The Eighth Circuit has held that "illegal drug use or transactions, without more, do not show untruthfulness." *Crimm v. Mo. Pac. R.R.*, 750 F.2d 703, 707-08 (8th Cir. 1984)(quoting *United States v. Hastings*, 577 F.2d 38, 41-42 (8th Cir. 1978).

The scope of cross-examination is within the discretion of the trial court.  Fed. R. Evid. 611(b). Rule 611 requires the court to "exercise reasonable control over the mode and order of interrogating witnesses and presenting evidence so as to (1) make the interrogation and presentation effective for the ascertainment of the truth, (2) avoid needless consumption of time, and (3) protect witnesses from harassment or undue embarrassment." "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness." *Id.*  The scope of cross-examination does not extend to matters that are irrelevant, or as to which the relevance is substantially outweighed by unfair prejudice.  Fed. R. Evid. 402, 403.

In the present case, there is evidence that witnesses the government intends to call at trial may have previously used khat, a controlled substance.  Because the witnesses' use of khat does

not bear on their credibility, the defendant should be precluded from examining the witnesses about drug use.

### H.    Cross-Examination of a Defendant

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony. *Mitchell v. United States*, 526 U.S. 314, 321 (1999); *Hendrickson v. Norris*, 224 F.3d 748, 751 (8th Cir. 2000) (witness, having waived fifth amendment right at prior trial, could be cross-examined with prior testimony from that trial). Also, if a defendant testifies, "his credibility may be impeached and his testimony assailed like that of any other witness." *Brown v. United States*, 356 U.S. 148, 154-55 (1958).

### I.    Character Witnesses

As a general rule, character witnesses called by the defendant may not testify about specific acts demonstrating a particular trait or other information acquired only by personal observation and interaction with the defendant; the witness must summarize the reputation or opinion of the defendant as known in the community. Fed. R. Evid. 405(a); *Michelson v. United States*, 335 U.S. 469, 477 (1948). On cross-examination of a defendant's character witness, however, the government may inquire into specific instances of defendant's past conduct relevant to the character trait at issue. Fed. R. Evid. 405(a).

30

In particular, a defendant's character witnesses may be cross-examined about their knowledge of the defendant's past crimes, wrongful acts, and arrests. *Michelson*, 335 U.S. at 479, 481 n.18. The only prerequisites are (1) that there be a good faith basis that the incidents inquired about occurred and (2) that the incidents are relevant to the character trait at issue. *United States v. McCollom*, 664 F.2d 56, 58 (5th Cir. 1981); *United States v. Bright*, 588 F.2d 504, 512 (5th Cir. 1979).

## J.    Defendant's Lawful Conduct

Other than testimony from character witnesses fitting within the narrow confines of Federal Rules of Evidences Rule 404(a)(1) and 405(a), evidence offered by defendant of his lawfulness or good conduct is not admissible.

"A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on [other] specific occasions." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990). Evidence of the defendant's other lawful behavior is irrelevant because lawful acts do not prove an absence of unlawful acts, including those unlawful acts alleged in the indictment. *See, e.g., United States v. Winograd*, 656 F.2d 279, 284 (7th Cir. 1981) ("[T]he district judge correctly refused to admit the evidence on this basis because evidence that [the defendant] engaged in certain legal trades is generally irrelevant to the issue of whether he knew of other illegal trades.") (citing *United States v. Dobbs*, 506

31

F.2d 445, 447 (5th Cir. 1975)).    Moreover, such evidence is improper propensity evidence and may be excluded under Rule 404. *United States v. Heidecke*, 900 F.2d 1155, 1162 (7th Cir. 1990) ("Proof that a defendant acted lawfully on other occasions is not necessarily proof that he acted lawfully on the occasion alleged in the indictment") (citing *United States v. Burke*, 781 F.2d 1234, 1243 (7th Cir. 1985) and *Herzog v. United States*, 226 F.2d 561, 565 (9th Cir. 1955)); *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (affirming district court's decision to exclude evidence that the defendant made two innocent trips to Jamaica because such evidence was irrelevant to the question of whether the defendant's trip to Jamaica at issue involved illegal drug activity); *United States v. Santos*, 65 F. Supp.2d 802, 845-846 (N.D. Ill. 1999) (excluding evidence of specific acts of lawful conduct and rejecting defendant's argument that such evidence was admissible on the grounds that it generally contradicted the government's theory of what occurred).

Evidence admitted pursuant to Rule 404(a) is limited to only the "pertinent" character traits of the defendant. Absent a direct showing that certain character traits are pertinent to the facts and issues in this case, a defendant must be prohibited from offering any specific character traits in his defense.    In addition, evidence admitted pursuant to Rule 405(a) is limited to a description of the subject's reputation or to a brief statement

of opinion, without support from specific instances of conduct. <u>See</u> Advisory Committee Notes to Rule 405. To permit evidence of specific lawful conduct or good acts would be to eviscerate the carefully drafted limitations of Rules 404 and 405.

Accordingly, all evidence of the defendant's lawfulness or good conduct, except evidence offered strictly in accord with the limitations of Rules 404(a) and 405(a), should be barred.

### K.   <u>Lay Witness Opinion</u>

Opinion testimony of lay witnesses is admissible if it is rationally based on the perception of the witness and helpful to a clear understanding of his testimony or to the determination of a fact in issue. Federal Rule of Evidence 701 provides:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

However, as indicated by the government's motion *in limine* pending with the Court, not all lay witness opinion is proper. The defendant should be precluded from offering lay opinion that he suffers from a mental disease, mental defect, or diminished capacity. *See Burns v. Gannon*, 173 F. 3d 1089 (8th Cir. 1999).

### L.   <u>Expert Testimony</u>

If specialized knowledge will assist the trier of fact in understanding the evidence or determining a fact in issue, a

qualified expert witness may provide opinion testimony on the issue in question. Fed. R. Evid. 702. An expert's opinion may be based on hearsay or facts not in evidence, where the facts or data relied upon are of the type reasonably relied upon by experts in the field. Fed. R. Evid. 703.

The government expects the following expert witnesses to testify at trial:

(1) Matthew Bryden will provide the jury with relevant background on Somalia's history, location, and sociology. His testimony will include discussion of jihadist armed groups in Somalia, including al Shabaab. He will provide details about al Shabaab, including testimony about its political, military, and theological objectives, its leaders, its relationship to al Qaeda, apprehensions raised by al Shabaab's global jihadist ambitions, its designation as a foreign terrorist organization by the United States, and its institution of a severe form of Sharia (Islamic law) in territories under its control. Mr. Bryden will testify as to al Shabaab's role in the ongoing Somali armed conflict and its actions which constitute terrorism within the meaning of 18 U.S.C. § 2339B. Mr. Bryden will further testify about five coordinated, truck-borne, suicide bombings in Somalia on October 29, 2008. In those bombings, Shirwa Ahmed, formerly of Minneapolis, killed himself attacking an office of the Puntland Intelligence Service in Boosaaso. Mr. Bryden will testify to features of those bombings,

including how they were carried out, to assist the jury in identifying these bombings as the work of al Shabaab. The testimony is also intended to help the jury understand that al Shabaab engaged in acts that are terrorism within the meaning of 18 U.S.C. § 2339B.

Additionally, Mr. Bryden will testify to the ways which al Shabaab funds itself, about the value of foreign fighters to al Shabaab, and the manner in which al Shabaab recruits foreign fighters and moves them through safehouses to training camps and to the front lines.

The government has also disclosed to the defense that Mr. Bryden has written about al Shabaab's role in the killing of his friend, Abdulkadir Yayha Ali, a Somali peace activist. Mr. Ali was killed ostensibly for cooperating in the preparation of a July 11, 2005 report written by Mr. Bryden for the International Crisis Group. In addition, Mr. Bryden was included on a target list taken from al Shabaab members, and he did not travel to Mogadishu for a period of time after his name appeared on that list. The government does not intend to introduce evidence of the murder of Mr. Bryden's friend, nor Mr. Bryden's inclusion on a target list, unless the defense somehow opens the door to that evidence. The existence of this evidence was disclosed to the defense in order that the government could meet its obligations to disclose evidence that might be capable of being construed as indicative of bias.

35

(2) Terrorism expert Evan Kohlmann will testify about the political situation in Somalia from 1993 to 2008 and describe the chaotic political situation and the rise of fundamentalist Islamic political groups including the Islamic Courts Union and al Shabaab and the response of the international community, including Ethiopia and the African Union.  To that end, Mr. Kohlmann will testify to some degree about the structure and leadership of al Shabaab and can identify for the jury several key leaders, members, and associates of al Shabaab who were encountered by the defendant's conspirators in Somalia.   Mr. Kohlmann may testify about individuals associated with al Shabaab.  In addition, Mr. Kohlmann will testify to the call to *jihad* that went out across the world in response to the presence of Ethiopian and African Union forces in Somalia and provide some background on the *jihad*-inspired migration of young men to fight in foreign countries such as Somalia.  He will testify to the videos released by al Shabaab for propaganda purposes, including the two videos that the government will seek to admit at trial:  (1) "No Peace Without Islam" and (2) "The Ambush at Bardale."

Mr. Kohlmann will also provide expert testimony regarding the travel of men from Western countries to foreign countries in order to fight *jihad*.  This testimony will include a discussion of the support networks, to include both financial and logistics support, the various travel routes into Somalia, and the methodologies

employed by individuals leaving Western countries to fight *jihad*. Mr. Kohlmann will testify that he is familiar with the lecture entitled the "Constants on the Path of Jihad" by Anwar al-Awlaki.

(3)   ATF Special Agent Martin Siebenaler will provide testimony about the AK-47 assault weapon, including its capabilities and specifications.

M.   **Video Evidence**

Courts have also allowed video evidence in other trials dealing with terrorism in order to help the jury understand motive and intent.  *See United States v. Abu-Jihaad*, 630 F.3d 102, 133-34 (2d Cir. 2010)(allowing a violent *jihadi* video to be shown that did not depict the defendant nor his co-conspirators); *United States v. Stewart*, 590 F.3d 93, 132-33 (2d Cir. 2009)(allowing a propaganda video featuring Osama bin Laden inciting violence into evidence). The mere fact that videos and other materials are found on websites and are widely available to the world online, does not make them irrelevant in a particular case.  *See United States v. Abdi*, 498 F.Supp.2d 1048, 1072 (S.D. Ohio 2007)(finding *jihadi* images accessed by defendant were highly relevant to motive, intent and conspiracy); *United States v. Kassir*, No. 04-CR-356(JFK) at 7-8 (S.D.N.Y. Sept. 11, 2009)(finding that pictures of bin Laden and al-Qaeda sayings found on defendant's computer are admissible because they help establish that defendant knew al-Qaeda to be a terrorist organization); *United States v. Khan*, 309 F.Supp.2d 789,

815 (E.D. Va. 2007) (denying defendant's claim of ignorance of group's violent mission because materials indicating support of violence were widely available on the internet).

Here, the United States intends to admit two videos in which the defendant's conspirators are present.[3]  Both videos reflect conduct that is plainly within the scope of the conspiracy.

### i.   Training Camp Video

The United States intends to admit a video of the activities at the training camp in southern Somalia.  A witness at trial will testify that he was present when the video was filmed and that it accurately depicts things that he saw, heard or experienced.  In addition, Mr. Kohlmann will testify that the video is widely-available over the internet and contains propaganda for al Shabaab, and he will identify some of the individuals depicted in the video.

### ii.   Ambush At Bardale Video

The government intends to admit a video of the "Ambush at Bardale" in which the defendant's conspirators effectuate the object of the conspiracy, that is, they carry out operations to kill Ethiopian solders walking along a road near Bardale, Somalia. Here again, the government intends to call a witness who was present when the video was filmed and can describe what is depicted in the video.  Mr. Kohlmann will testify that the video is

---

[3] Transcripts containing English language translations of foreign language spoken on the videos will be provided to the Court, parties, and jury at trial.

available over the internet and contains propaganda for al Shabaab. He will also identify some of the individuals depicted in the video.

### N.   Audio Recordings

The government also expects to admit evidence that contains voice recordings in a foreign language, including recordings of the defendant's voice.  When doing so, English language transcripts will be provided to the Court, the defendant, and the jury.

### O.   TECS Records

The Treasury Enforcement Communication System ("TECS") is a multi-agency, limited-access law-enforcement computerized database that contains, among other things, information pertaining to international border crossings.  The Ninth Circuit has held that TECS is admissible at trial as a public record pursuant to Rule 803(8).  *United States v. Orozco*, 590 F.2d 789, 793 (9th Cir. 1979).

Here, the United States intends to admit into evidence TECS records to assist the jury in understanding the departure dates and any return dates of men who traveled to Somalia, which does not require the testimony of an expert.  *See United States v. Oceguerra-Aguirre*, 70 Fed. Appx. 473, 478 (9th Cir. 2003) ("Oceguerra directly questioned the reliability of the TECS evidence, challenging the manner in which the information was recorded. Agent Morgan merely laid a proper foundation for the

recording of the data when he testified from his personal knowledge as a custodian of the TECS records.   This was not undisclosed expert testimony.").

**P.   <u>Summary Testimony and Charts</u>**

Summary evidence is properly admitted when (1) the charts fairly summarize voluminous trial evidence, (2) they assist the jury in understanding testimony already introduced, and (3) the witness who prepared the charts is subject to cross-examination with all documents used to prepare the summary. *United States v. Spires*, 628 F.3d 1049, 1052-1053 (8th Cir. 2011) (defendant in drug prosecution challenged admission of summary charts of cell phone records because chart contained speculative conclusions as to who made and received certain calls; court finds any error in admission of summary charts was harmless).   Summaries may include assumptions and conclusions, so long as they are based upon evidence in the record.   *Id.*

Here, the United States intends to admit a summary of toll records.   Toll records qualify as business records under Rule 803(6).   *See United States v. Wills*, 346 F.3d 476, 490 (4th Cir.2003) (cell phone records admissible under business records exception).   Toll records are the type of record for which a summary under Rule 1006 is appropriate.   *See United States v. Gaitan-Acevedo*, 148 F.3d 577, 587 (6th Cir. 1998) ("At trial, [the agent] explained, to the district court's satisfaction, his method

of loading and compiling the information from computer toll records into the summary exhibit."). The government has provided the defendant with notice of its intent to use a summary exhibit. The government intends to authenticate the underlying records pursuant to Rule 902(11). The records and certifications are available for the defendant's inspection upon request.

The government intends to admit an organization chart under Rules 611(a) and 1006 that summarizes those involved in the conspiracy, the names used by members of the conspiracy, and the corresponding travel dates on which seven members of the conspiracy left the United States for Somalia in the fall of 2007. The evidence underlying the summary charts will be admitted into evidence through documents, such as the DVS records, TECS records, and travel records; witnesses will testify about the names used by conspirators and their travel to Somalia.

Rule 611 allows the Court to exercise its discretion to admit charts into evidence to "make the interrogation and presentation effective for the ascertainment of the truth." *See* Fed. R. Evid. 611(a). Here, the jurors will hear testimony that many of the witnesses shared a common name. To illustrate the potential for confusion, the government notes the following: Shirwa Ahmed, Salah Ahmed, and Ahmed Ali Omar were all members of the conspiracy and all have "Ahmed" in their name; other members of the conspiracy included as were Abdifatah Yusuf Isse and Abdiweli Yassin Isse; and

41

once the men arrived in Somalia, Ahmed Ali Omar chose the name "Mustafa," Abdifatah Isse chose "Omar," Kamal Hassan chose "Abshir," and Khalid Abshir chose "Abdullah." A reference during a witness's testimony to "Ahmed," "Isse," or "Abshir" may cause confusion. To assist the jury in following the testimony, the government respectfully requests permission to admit a summary chart early in the case that summarizes the names, nicknames and travel dates of the conspirators in the fall of 2007 and includes photographs. *See United States v. Pinto*, 850 F.2d 927, 935 (2d Cir. 1988) (stating "[t]he government's summaries included the names of identified participants in the telephone conversations, the numbers used by conspirators and the addresses of several conspirators' residences, where calls were placed or received" and finding no error in allowing the charts to be admitted into evidence).

The defendant has agreed that the organization charts (with names) can be provided to the jury.

### Q.    **Authentication and Identification**

Federal Rule of Evidence 901(a) provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." The introducing party "need only demonstrate a rational basis for its claim that the evidence is what the proponent asserts

42

it to be." *United States v. Coohey*, 11 F.3d 97, 99 (8th Cir. 1993).

### R.   Judicial Notice

Federal Rule of Evidence 201(d) provides that "(a) court shall take judicial notice if requested by a party and supplied with the necessary information." A judicially noticed fact must be one not subject to reasonable dispute in that it is (1) either generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. F.R.E. 201(b). The government will ask the court to take judicial notice of the fact that al Shabaab was designated a Foreign Terrorist Organization by the U.S. Department of State on February 26, 2008, and that the designation was published in the *Federal Register* on March 18, 2008.

### S.   Use of a Firearm as a Demonstrative Exhibit

The government respectfully requests permission to allow a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives to bring an AK-47 as a demonstrative exhibit at trial. Demonstrative exhibits, or replicas, may be used at trial in the "broad discretion" of the trial judge. *United States v. McIntosh*, 23 F.3d 1454, 1456 (8th Cir. 1994).

The government expects this demonstrative exhibit will be identified as similar in type to the firearms possessed by the

defendant's conspirators at trial based on photographs shown to the defendant's conspirators by the ATF agent. The government further expects that ATF Special Agent Martin Siebenaler will testify to features of the firearm that make it useful as an infantry assault weapon. The firearm will, of course, be a demonstrative exhibit only and would not be present in the courtroom at any time other than during the testimony of Agent Sienbenaler. Further, the firearm will be rendered completely safe with a firearm locking device.

### T. Admission of Jail Calls

The government expects to introduce statements of the defendant at trial that resulted from the routine recording of inmate telephone calls. At the time these calls were recorded, the defendant well knew they were liable to being monitored and recorded.[4] The Eighth Circuit has held that when these warnings have been given to an inmate, and the inmate continues to use the jail's telephone system, the inmate has impliedly consented to the recording of his telephone calls. *United States v. Lucas*, 499 F.3d 769, 780 (8th Cir. 2007). There is no additional requirement that jail staff go further and specifically warn inmates that what they

---

[4] Indeed, the defendant unsuccessfully sought to suppress jail calls by way of a motion filed on February 14, 2012. *See* Docket Number 117. During the hearing on this motion, the defendant claimed he was not properly advised that his calls were monitored and recorded. The magistrate judge rejected defendant's claim and the district court affirmed the magistrate judge's decision on this point.

say on the telephone might be used against them in court.  *Lucas*, 499 F.3d at 780; *see also, United States v. Eggleston,* 165 F.3d 624, 626 (8th Cir. 1999).

**VII. <u>CONCLUSION</u>**

The government is ready to begin trial on October 1, 2012.


Dated:  September 27, 2012       Respectfully Submitted,

                                B. TODD JONES
                                United States Attorney

                                *s/ John Docherty*

                                BY: JOHN DOCHERTY
                                Assistant US Attorney
                                Attorney ID No. 017516X

                                CHARLES J. KOVATS
                                LEEANN K. BELL
                                Assistant U.S. Attorneys

                                WILLIAM M. NARUS
                                Trial Attorney
                                National Security Division